All right, we're going to call the next case. 17-2665, Peeble v. Craig Burrell. I'm letting everybody get in first. And I'm sorry, did the clerk call the next case? I didn't hear it. Or I was talking to my partners. Okay, if the lawyers can just step up please for us and identify yourself. I don't know if you were in here earlier, but both sides have 15 minutes. We're not going to tie you down, but please try to keep it within 15 minutes. And for the Avalon, if you want to reserve a few minutes, please let us know. And of course, at all times, keep your voice up. Would you please identify yourself for the record? Sure. Deborah Lovie from the Exoneration Project on behalf of the appellant Frank Burrell. And I'd like to reserve four minutes if I could. Assistant State's Attorney Brian Hodes on behalf of the people of the state of Illinois. Okay, I'm sorry, I didn't get your last name. Hodes. Thank you. Thank you very much. You can ask whenever you're ready. Thank you. Frank Burrell's lawyers failed to present a single defense witness. Not the known employer who testified that his records show Mr. Burrell was at work for over two hours on the night of the shooting. Not the known community member who heard the state's chief witness searching for who had shot at him. And not one of Mr. Burrell's known alibi witnesses. After 20 years of incarceration, Frank Burrell deserves a trial with competent counsel. This morning, I'd like to begin with the defense counsel's omissions regarding David Boone, but I'm happy to discuss any of counsel's lapses. You read them all. And the trial judge heard them all in the post-conviction. So tell me why the judge is wrong. Well, the judge is wrong. I'll begin with David Boone to explain why the judge is wrong. When you look at the performance prong, the law in Illinois is very clear that when defense counsel fails to interview a witness, that that can never be attributable to trial strategy. The trial court assumed that defense counsel, because he didn't know precisely what it was that David Boone was going to say, and didn't understand that that was going to be as powerful exoneration evidence as it was, that it could be, that it was excusable not to present Mr. Boone. The law is extremely clear in Illinois that that doesn't excuse it. This is a witness who was on the defense counsel's disclosures. He showed up to talk to a defense investigator. The defendant had told his counsel of this witness. He did everything he possibly could. So the court's first mistake with regard to Mr. Boone was saying that this is not deficient performance. Under the clear law in Illinois, it obviously is. With regards to prejudice, the court made another error. This is unquestionably evidence that would undermine confidence in the verdict. Mr. Boone was a fabulous witness. He was disinterested. His testimony was unrebutted. It was corroborated by others. It was importantly, it was credited by the trial court in this case. The court accepted it. He was a military veteran. He was a neighborhood business owner. He wasn't in a gang. He came forward at his own initiative. And he saw the state's chief witness, Mark Davis, in the days after the shooting, surveying crowds and trying to figure out who shot him. Now, Mark Davis took an entire month before he named the shooters to the police. And he named three people that he knew previously, that he had known for six or seven years. And that's a pretty long gap. And it's pretty inexplicable to wait that long. And David Boone would have made sense of that testimony. David Boone would have shown Mark Davis was using that time to try and figure out who he was going to pin this crime on. And Davis' testimony was pretty shaky to begin with. Remember, he didn't tell 911 that he knew who shot at him. He didn't tell the detectives, one of whom was an old friend, that he knew the shooters. He went to a lineup where he didn't show that he knew that, you know, he pretended like he was participating. That's not uncommon immediately after a shooting in a neighborhood that's gang infested. Isn't that true? That's not uncommon that nobody wants to talk to the police at that point. This is someone, though, who did talk to the police. He gave a description of the car. He gave a description of the shooters. However, they were, they didn't match until a month later when he's like, oh, yeah, actually, it's these guys I know who are in my gang. And at that point he names. But in the aftermath of the shooting, he said, I saw the car. It was silver or gray. And then later, when it didn't fit the facts, he's changed it to white and boxy. And in the aftermath of the shooting, he said, I want to participate. He went to a lineup. And then he waits a month later. And during that month, David Boone makes sense of what happened during that month. During that month, he was going around the neighborhood saying, who came at me? And trying to figure that out. Had the jury heard that, that unquestionably would undermine confidence in the verdict in this case. Because you had such a shaky identification for Mark Davis to begin with. And Davis' view from his own description of the shooter, he describes that he's at a stop sign. A car, he's up in a truck that's higher. A small car with tinted windows pulls up. And the shots we know hit Renee Battle from behind. So the shooting happens before the car comes head to head with him. And he describes it in two seconds. He's trying to protect his young son, protect his girlfriend, and drive away. In the aftermath, he told the police he didn't even know how many people were in the car. Or whether there was more than one person in the car. And that testimony makes sense until a month later, suddenly he's pointing the finger at somebody. And David Boone was crucial testimony to make sense of that. To make sense of why it took a month. David Boone had no interest. He had no reason to make this up. All he was doing  he writes a pro se affidavit because presumably he's worried that he won't be able to share this information. He's just seen an injustice happen in his neighborhood. He's not he has no motive at all in this case. He's the only person who's not a player. He's not in a gang. And he saw Mark Davis going around the neighborhood trying to figure out who shot him. That is very troubling evidence. And again, this isn't, we're not trying to win an actual innocence case here. All we're trying to say is defense counsel should have presented it. You know, Frank Burrell was doing his job. He was saying somebody in the neighborhood can help me. Please talk to this person. His family paid $1,000 for an investigator. And David Boone, the Court again credits the testimony, David Boone showed up to talk to this investigator. And defense counsel did not bother to talk to Mr. Boone, find out what his testimony was, and present it to the jury. So that's the Court's first error. That should undermine confidence in this verdict. The second error that I'll discuss is the evidence that Mr. Burrell was at work on the night of the shooting. Now Robert Mack, again, is a disinterested party. He owned a business that made Hollywood movie trailers for 37 years. He had nothing to do with this crime. There's no plausible reason why he would have made himself an accessory to a murder to lie for a two-year part-time janitorial employee. He would have testified that his business record showed that on the night of the shooting, Mr. Burrell was at work from 625 p.m. until 845 p.m. And that was corroborated testimony with a time card which has the time stamp. And the machines, as you know, they only stamp it when you go in. He had written in his exit time. That was not a time stamp. That, as Mr. Mack testified, was the common practice that everybody would punch in and they would sign out and Mr. Mack said that it looked like it was Mr. Burrell's handwriting. But even if this court is troubled by the fact that there was the handwritten part out, how did the card get stamped? Neither Morton nor Hatcher talks about in the middle of this joyriding and drinking and drugs, we stopped off at his workplace so that he could sign in, not do his work, and then jot down what time. I mean, that wasn't there. Nobody ever said that that happened. And Mr. Mack specifically testified, if that had happened, they would have noticed because this was a dust-sensitive business. This was a very professional operation, and if the garbage hadn't been taken out and the floors weren't clean and everything wasn't dusted, they would have noticed. So I have no idea how that card could have gotten stamped except what Mr. Mack says, which is that his regular course of business is to have them stamp in, to write down the timeout. It looked like Frank's handwriting that wrote it down on the timeout. The place seemed clean. He has every reason to believe that Mr. Burrell was at work. And again, when you think about prejudice here, this isn't an actual innocence case. This is an ineffective assistance of counsel case. I mean, does this undermine your confidence in the verdict is the only question that the Court should have been asking. And boy, does it. I mean, Matcher or, I'm sorry, Morton and Hatcher were terrible witnesses. They were both suspects of this murder themselves. Neither one of them got charged. But they were both suspects. They both have long felony records. Hatcher repudiates his testimony during the trial. Morton faced 30 years. He faced charges that total up to 30 years that get dropped in the week before the trial. They're both Davis' gang underlings. Although Davis says he's not a gang. Davis says he's not a gang. He's a police officer who's his friend, who says he isn't. Who says he is. And the state's theory at the trial is that he was. And Matcher and Morton all say he was. And that, again, should give you a question about Davis' credibility. You know, his credibility is, you have two, you know, untainted citizens who are trying to do the right thing here and see justice being done against the testimony of these three gang members whose testimony, frankly, doesn't gel with one another or make sense. Is it appropriate for us to look at whether he was a credible witness or not? Well, the court made specific credibility findings. Excuse me. This court made specific credibility findings. And this court should adhere to them. And those credibility findings all went in favor of the post-conviction witnesses. The court found that Mr. Mack, the employer, was highly credible. The court found that David Boone was credible. The court found that Mr. Burrell's grandmother, Jean Malcolm, who testified that her car, who explained how her car was not the one used in the shooting and, in any case, Mr. Burrell had never used it, he found her credible. The court found Dino Malcolm credible. He was the uncle who said that all these people showed up to talk to the defense investigator and the defense investigator failed to show. So those are credibility findings. The court doesn't need to make credibility findings. With regards to what the court needs to make is the legal assessment of whether or not the court below manifestly err in finding that there was no deficient performance and then finding that there was no prejudice based on it. Does that make sense? Yes. Okay. Great. So, you know, when you apply the performance prong and the prejudice prong, again, to this evidence that Mr. Burrell was at work, defense counsel's specific strategy was to impeach Hatcher and Morton. And Mr. Mack and the time card at work certainly would have furthered that strategy. We know defense counsel knew of these witnesses and there was no downside to presenting it. I mean, there was no possible downside, even if this evidence doesn't convince you 100%, it only convinces you 90%. To have an employer say this was a reliable employee, he had a great work ethic, he always showed up, he never, you know, punched in when he didn't do his work, I have every reason to believe that he was at work on the night of the shooting, there's no reasonable trial strategy for not putting on that evidence. And with regards to prejudice, again, Mr. Mack, his credibility against Hatcher who repudiated his testimony and Morton whose testimony was extremely incentivized, this would unquestionably undermine confidence in the verdict, which, if I've done my homework, much of this court found on the second stage dismissal that if this evidence panned out, that that would undermine our confidence. And I would urge the court to continue on with that. Just briefly, there's also a lot of other evidence of Mr. Burrell's innocence. We have Sundiata Brown, who is Davis's friend, Mark Davis was State Witness's friend and a fellow high-up gang member who heard Mr. Davis looking for who shot at him and heard Mr. Davis admit that he had no idea who shot at him. We have Michael Froehlke, Davis's other fellow gang member, who heard that this was all just a plan, that they didn't know who did it, that Mr. Burrell had tried to do right, he tried to leave the gang, he was taking care of his family, he was working, and when somebody leaves the gang, they go into bad graces and the gang decided to pin it on him. You have Gene Malcolm, who, like I said, would have established the car wasn't there. You have Anthony Wilson, who would have established when Mr. Burrell came home. None of this evidence was rebutted. Defense counsel put on no defense, no witnesses. The standards here are met for ineffective assistance of counsel. Mr. Burrell has been trying for 10 years on this post-conviction petition. It's been up to this court twice already. This is the third time up here. He has served 20 years. We'd ask this court to reverse. I'll reserve the remaining for rebuttal. Thank you. Thank you. Again, Brian Hodes, Assistant State's Attorney Brian Hodes on behalf of the people of the State of Illinois. In this case, defendant had a full and fair hearing into his allegations of ineffective assistance of counsel against his trial counsel. Judge Gaughan was the same judge who presided over his trial, conducted a lengthy and thorough hearing into these allegations of ineffective assistance of counsel per this court's remand, and he determined that defendant did not receive it, could not prove that he received ineffective assistance of counsel. After hearing all the witnesses, defendant cannot meet his burden and show that, and demonstrate that Judge Gaughan's decision was based on the evidence, it was not arbitrary, and it was reasonable. Can I ask a question? I know Judge Gaughan very well. I know the defense lawyer. Bill Murphy tried many cases in front of me when I was at 26th Street. He has been an excellent lawyer. I read what the judge said that he didn't think this was ineffective assistance. I want you to talk about the time card. When two witnesses say they're running around in the car with the shooter from 3 o'clock to 7 o'clock, I mean 3 to 10, drinking and smoking marijuana and doing whatever they're doing before the shooting, and then there is a time card at a business kept in the ordinary course of business, and what the judge called a credible witness, the owner, who says the man's card was stamped at 6 something and going out at 8, and the lawyer doesn't even talk to that witness when Dino has told him about this. How is that not something that would undermine confidence in this decision? Your Honor, the lawyer did talk to the witness. The lawyer testified that he received the card. I'm sorry, you're right. How could he not appreciate the value of that? He said it didn't go to the alibi. He did impeach two witnesses, actually three. Assuming the time card, he did exactly what he was supposed to as an attorney. He appreciated the value of the time, potential value of the time card after speaking to defendant, and then he called up to see how the time card might be used. He spoke to someone, the owner, presumably Mr. Mack, based on Mr. Mack's testimony about the time card. If you look at the time card, it is very, very flimsy evidence. Mr. Mack, moreover, could not do any more with this time card. Judge Gant didn't think it was flimsy evidence. He didn't speak about that either way. He said he thought that Mr. I can't think of the name of the owner, was a credible witness when he said that his testimony regarding that time card, and it was kept in the ordinary course of business. My understanding, no, Judge Gant's assessment of Mr. Mack was that he was a man who had a lot of time and a lot of information that was valuable. What about Mr. Burrell? If he hadn't been there, the facility wouldn't have been cleaned, all the things that Mr. Mack testified to that were kind of noted that Mr. Burrell must have been there because otherwise there would have been certain deficiencies with regards to the facility, the environment, and so on and so forth. Those are all great questions for cross-examination, though, counsel, aren't they? Yes, but we don't know the full extent of the conversation that Counsel Mr. Murphy had with Mr. Mack. We know that he did what he was supposed to do, which was that he had a conversation with Mr. Mack to talk about the timesheet and to authenticate that anybody could have signed in or out, which is true, but if you look at the card, and that he didn't think that it didn't have defendant's signature, again, true if you look at this little card, and that he didn't believe that there was anyone who saw a defendant there at that time and that he didn't believe that it was good. The presumption is that counsel performed reasonably under the circumstances. We don't know the full extent of this conversation, and we don't certainly Mr. Murphy didn't have his notes because they vanished. What we do know is that Murphy conducted a reasonable examination based on his testimony, and that Mr. Mack's testimony is actually consistent with that, in that he admitted that he wasn't there during that entire week and that he apparently had a conversation with an attorney for defendant during that time. It is fair to say. I read the transcript. I don't remember, and I'm going to go back and read it. Are you sure he said he was not there the entire week or just that night? I don't remember reading it. That's actually something I'm getting from, I believe, Judge Gaughan's findings, so I could be wrong on that. That's something I'm reciting. That's from Judge Gaughan's finding, that he wasn't there that week. In any event, he could not say, and no one who worked there could say the defendant was there at all that day. We don't know, and we don't, again, we don't know the conversation. We can't know the conversation. We know two people's versions several years after the fact, over ten, that the conversation occurred. The assumption under Strickland is the counsel did what he was supposed to do. The testimony is the counsel did what he was supposed to do. Okay, and what about the, I guess, I think the guy's name is Mr. Boone. Boone is, yeah, the principal witness that they're talking about. Mr. Boone, first of all, as this Court noted before, in the prior, last time, Boone is, at best, a potential impeachment witness as to Mr. Mack. Boone would have testified that several days, I guess it was a couple days after the shooting, he saw Davis, I'm sorry, Mark Davis, that's why I'm getting confused. It's the way Mark was spelled. I apologize. That he saw him get out of a car and ask a number of people who tried to change me, which was slang, or is slang, for who tried to kill me, and that he interpreted that as who tried to, you know, who was the shooter. Throughout the case, Davis has explained the fact that he didn't come right to the police, because he was concerned about exactly who ordered the killing, basically. And he explained this in detail during the evidentiary hearing, that what he was concerned with was his safety and the safety of the six-year-old son who was in back of the car at the time of the shooting. And he's in, I'm sorry, I read this, so it just kind of disturbs me. He's at the post-conviction petition, even though he's afraid to be in Hyde Park. He's in Hyde Park, going up and down the streets. He's concerned, and he wants to know what he did wrong. That's his testimony. He wants to know. He said sanction. Sanction is a gang terminology, if I've ever heard one. Yeah, well, the way he's using sanction is it's a negative, like as in you sanction a lawyer. And frankly, the term change is also not a term I was familiar with for kill, but I looked it up, and that also can mean kill. Someone tries to change someone. So he wanted to know who ordered the killing, or who ordered the changing. So he says that he never said this. So at most, this is potential impeachment. The judge found that this wasn't prejudicial under Strickland. This potential impeachment would not have sufficiently undermined the case. And that was a correct finding, and the defendant cannot show that that was manifestly erroneous. Because it's only impeachment testimony, first of all, and there were other cases where the defendant affirmed the original conviction. There were three witnesses. Yes, Davis is the most important witness, but three witnesses testified that they shot, defended, reached out of the car, and fired the shot that killed Renee Bell. Not one. The cases, the impeachment, ineffective assistance cases, the defendant relies upon in his briefs, all involve much, much stronger impeachment evidence. Or cases where it wasn't just impeachment evidence. It was a lot of evidence of which impeachment was a small part that counsel failed to introduce. They also frequently involved cases where counsel failed to do any cross-examination whatsoever. Here, counsel cross-examined Davis thoroughly. Moreover, the defendant had an evidentiary hearing in this case where he got to literally conduct the impeachment of Davis that he wanted to conduct a trial. Davis testified again. He was specifically asked the questions, and the impeachment evidence was introduced. And the judge, Judge Gaughan, the same judge who did the trial, found that it was not sufficient under the Strickland standard to warrant a claim of ineffective assistance of counsel. The defendant has to show that that was manifestly erroneous, not just that he thinks it was a bad idea or a bad ruling. That's a high standard, and it deserves quite a bit of deference because all we have is a cold, inanimate record. And the judge conducted these hearings. And the judge saw these witnesses. And the judge actually also conducted the trial in the first place. And the judge took a lot of care in this case. The judge didn't just sort of hear argument and then just say, I'm deciding A or B. The judge reviewed all the records, then heard oral argument from counsel in this case, then took time, reviewed everything again. When I say all the records, I mean the trial record, too. And then issued a written ruling explaining his ruling. This was not an off-the-cuff or a careless decision. This was a thoughtful decision that deserves that kind of deference. So I want to briefly touch on these other witnesses because counsel, they don't have time. Do I have time? I'll let you take a couple more minutes. Thank you, Your Honor. Okay. Cyndianna Brown. They're talking about whether or not counsel was ineffective for failing to call Cyndianna Brown. Cyndianna Brown wasn't. Well, you don't have to. That's somebody they found out afterwards. Okay, right. Okay. Threadfield and Wilson, the judge found that he would not accept the affidavits because they were not subject to cross-examination. That's a proper ruling and a proper exercise of discretion. Defendant's uncle did not have any information that would have been useful at trial, and the judge made a correct ruling on that point. Plus, defendant's uncle spoke to counsel about many, many times and defendant's co-counsel, Mr. Peters, which is another thing that makes this a difficult case. They're going to find counsel was ineffective because Mr. Peters, he can't prove what Mr. Peters did or didn't know, I guess. Defendant's grandmother, her information that defendant couldn't have used that car, that's not prejudicial, as the judge correctly found, because he wasn't found guilty of using that car. He was found guilty of driving a car, a white boxy car at that, not her specific Chevy Beretta. So even assuming arguendo, they just I mean, Mr. Davis didn't even say a white car. He went back and forth. He said gray or silver, gray or silver, gray or silver. Then it became white. Yeah. I don't think he was focused on the color of the car being driven, which because, after all, the key thing is whether he was able to identify the shooter, and he was also able to identify who else was in the car. One of the reasons it took him a while, I think, also had to do with the fact that he knew who the people were and he didn't know their proper names and all of that. And that probably took a little while for him to put together. But he identified all of them. He didn't say that. Okay. Well, I think his testimony at one point was that. Maybe it was during the trial, if not the evidentiary hearing, because I reviewed them both. I did, too, and I don't remember that. Okay. Well, I think it would account for it. The other reason not to call the grandmother and the uncle and such is that they're relatives, and when you call relatives, there's always a reason that, you know, that might There's always a possibility of bias. But the judge did say that they were He said that they were credible witnesses, but that they didn't have useful information. He said they were reliable and consistent. Yes. But the question was, was the information they had useful? Because I can be reliable and consistent, but if I'm not providing useful information, it doesn't matter. And that was that Manette, to return to your original question about Mr. Mack and the card, the evidence, the card, and Mr. Mack's testimony, he could testify the defendant was a good employee, but defendant's employment wasn't an issue. And he knew also I want to go back to one little thing about Mr. Boone and Mr. Mack. They're not completely, you know, disinterested witnesses who appear from nowhere. Mr. Mack knew defendant because he was friendly with the family. That's why he hired him. He knew defendants. And Mr. Boone was a close, I think a pretty close friend of defendants because defendant, after all, had attended his wedding and he knew him through his fiancee then wife. And at one point Mr. Boone mentions that he and his wife went all the way out to southern Illinois to visit defendant in prison. So I think that's not just a completely disinterested relationship. Thank you. Thank you, Your Honor. And for these reasons, and for those who are forth in our brief, people respectfully request that this court affirm the denial of post-conviction relief. Thank you. Counsel's discussion about whether or not the evidence was useful brings us full circle to your initial question when I stood up, which is what was the trial court's error? The trial court in assessing prejudice kind of asked would this have convinced me on a more subjective level instead of asking the objective question of whether or not, you know, under Strickland the standards were met, was this objectively unreasonable behavior, and particularly with regards to prejudice, you know, the objective question of whether or not there's a reasonable probability that the result could have been different. Instead, the court was sort of imposing its own personal value perhaps because it had seen the trial court, it went with a subjective standard instead of the objective standard, and that's where the manifest error occurred. With regards to, I'll just address the two big ones briefly because the court had some questions. With regards to the MAC evidence, whether or not the court wants to call the error was inadequate investigation or the failure to present, either way, counsel's decision not to present that evidence was objectively unreasonable. That was deficient performance. With regards to the prejudice, remember, it doesn't have to be 100 percent convincing. It has to, you know, undermine confidence in the verdict. Mr. MAC certainly undermines confidence. He testified that it was his belief that Mr. Burrell was at work, and he explained how the time card backed that up and why he thought that. Now, could they cross-examine and try and, you know, prove that there was some subcontracting going on and somebody else in the janitorial industry was doing it for Mr. Burrell? They could try. It's far-fetched. It's, you know, in my mind sort of wild imagination. But the fact that they can come up with some way that they might have been able to poke hole on cross-examination does not undermine the objective prejudice standard that this court should be looking at. What about their argument that MAC supposedly wasn't around all week? That is contrary to the testimony, first of all. That is not in the record. Mr. Burrell's time card shows that he was there Monday, Wednesday, and Friday. It shows the hours that he was there. And Mr. MAC discusses the regular course of business. You know, he's president of this successful company for 37 years. Presumably, you know, they can try and argue at trial should we get one that Mr. MAC had no idea that the place was a mess. But there's nothing in the record to support that. The record, he says, is that he would have known this was a very sensitive business. It was a very professional operation. He would have known if Mr. Burrell wasn't showing up and doing his job, the garbage cans would have been overflowing. The floor would have been a mess. So there's nothing in this record that rebutted Mr. MAC's testimony. And the court made no findings that Mr. MAC's testimony was rebutted. Again, it found it credible. It just didn't find itself persuaded on a personal level with regards to prejudice. That is the wrong standard. This undermines confidence in the verdict. Briefly, with regard to Mr. Boone, counsel talked about, you know, at most this was potential impeachment. Obviously it was very powerful impeachment evidence. The law in this state is clear that that can be enough to support ineffective assistance of counsel. The other two witnesses that counsel was highlighting on, Hatcher repudiated it, so it's really one other witness. But both of them were accused of the murder themselves and then got off scot-free when they pointed the finger at Mr. Burrell. Certainly having someone like Mr. Boone, a business owner, a non-gang member, a professional in the community, saying what he heard would undermine your confidence in the verdict. I would ask the court to reverse the dismissal of the post-conviction petition. I respectfully hope that we could see a ruling like that expeditiously. The witnesses in this case are getting older. It's been ten years on this petition. He's been incarcerated 20 years. We hope that the court will see justice done. Thank you. Thank you, counsel. All right. Again, we will take this case under advisement. We have to change panels, so we'll take a brief reset.